IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CAREY D. EBERT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.: 4:15-cv-225-0 |
| | § | |
| MICHAEL GUSTIN, ET AL., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS MICHAEL GUSTIN, JEFFREY WOHLER, AND JOHN PAUL DEJORIA'S MOTION AND SUPPORTING BRIEF TO PARTIALLY EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT, ROBERT G. MANZ**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT AND AUTHORITIES .............................................................................. 2

     A. Manz's opinions and testimony concerning "Cash Disbursements" or the "Cost of Sustaining LSI" should be excluded as irrelevant and unreliable. ............ 2

     B. Manz should not be permitted to testify that LSI's accounting records were kept in a system that was susceptible to manipulation and/or that such records did not meet federal requirements for public companies. ................... 7

     C. Manz should not be permitted to testify or offer opinions regarding the value of restricted stock shares issued by LSI. ....................................................... 8

     D. Manz should not be permitted to testify about any opinion based on a claim that LSI was a "fraud from inception." ........................................................ 10

     E. Manz should not be permitted to testify about purported "red flags" or "badges of fraud" associated with an alleged "pump-and-dump scheme." .......... 11

PRAYER ....................................................................................................................................... 12

CERTIFICATE OF SERVICE .................................................................................................. 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ..................................................................................................... 1

*U.S. ex rel. Dekort v. Integrated Coast Guard Sys.*,
    2010 WL 8367619 (N.D. Tex. Oct. 8, 2010) ............................................................... 7

*Hendrix v. Evenflo Co.*,
    609 F.3d 1183 (11th Cir. 2010) .................................................................................... 1

**Other Authorities**

FED. R. EVID. 104 ................................................................................................................. 1

FED. R. EVID. 401 ........................................................................................................... 1, 12

FED. R. EVID. 402 ........................................................................................................... 1, 12

FED. R. EVID. 403 ........................................................................................................... 1, 12

FED. R. EVID. 602 ........................................................................................................... 1, 12

FED. R. EVID. 702 ........................................................................................................... 1, 12

FED. R. EVID. 703 ....................................................................................................... 1, 9, 12

Pursuant to Federal Rules of Evidence 104, 401, 402, 403, 602, 702, and 703, Defendants Michael Gustin ("Gustin"), Jeffrey Wohler ("Wohler"), and John Paul DeJoria ("DeJoria") (collectively, the "Defendants") are seeking to partially exclude testimony and opinions expected to be offered by Robert G. Manz ("Manz"), an expert retained by Plaintiff Carey D. Ebert, as Trustee (the "Trustee") for the Chapter 11 Estate of Debtor, Latitude Solutions, Inc. ("LSI"). In support thereof, Defendants would respectfully show as follows:

### I.     INTRODUCTION

The Supreme Court has observed that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty of evaluating it." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 595 (1993). Because of this risk, the Court—in weighing possible prejudice against probative value—exercises more control over the Trustee's experts than over lay witnesses she intends to call. *Id.* Moreover, the burden is on the Trustee to establish the admissibility of the testimony. *See* FED. R. EVID. 702, 2000 advisory committee's note. To meet this burden, the Trustee must establish that the proposed testimony, and the underlying information supporting that testimony, are both reliable and relevant to the issues at hand. FED. R. EVID. 702, 703; *Daubert*, 509 U.S. at 595; *Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

Here the Trustee intends to call Manz as an expert to testify about damages allegedly suffered by the LSI Estate for which Defendants are potentially liable. In support of his opinions, Manz produced a report and has been deposed.[1] As discussed herein, certain of his opinions and proposed testimony are either not reliable and/or irrelevant to the issues at hand. Accordingly, Manz should not be permitted to provide testimony to the jury.

---

[1] A true and correct copy of Mr. Manz's Report and Schedules are attached hereto as Exhibit 1, and excerpts from his deposition taken in this case are attached hereto as Exhibit 2.

## II. ARGUMENT AND AUTHORITIES

### A. Manz's opinions and testimony concerning "Cash Disbursements" or the "Cost of Sustaining LSI" should be excluded as irrelevant and unreliable.

In paragraphs 43(a), 54-57 and Schedules 9 and 14 of his report, Manz calculates numbers based on what he refers to as either "cash disbursements" or the "cost of sustaining LSI." Manz then opines that these numbers can be used as a measure of damages for the fraud or breach of fiduciary duty claims asserted by the Trustee against the Defendants. *Id.*

To calculate these numbers, Manz simply adds up all of the cash that LSI spent to operate its business on a monthly basis since July 2008.[2] For example, Manz calculates that LSI spent: (i) approximately $28.8 million in cash since LSI was formed in July 2008, (ii) approximately $11 million in cash since DeJoria joined the LSI board in mid-to-late October 2011, and (iii) approximately $6.4 million in cash since Wohler and Gustin joined the LSI board in mid-to-late January 2012.[3] Manz should not be permitted to so testify, however, because these calculations provide no basis for a jury to actually assess any damages against Defendants for fraud or breach of fiduciary duty – they are irrelevant and meaningless numbers for that purpose.

First and foremost, Manz's opinions do not consider at all what LSI spent the cash on to operate its business. As just one example, during the company's life, LSI spent approximately $10 million in cash to purchase property and equipment.[4] The vast majority of this money was paid to LSI's two primary equipment manufacturers, Jabil Circuit, Inc. ("Jabil") and IP Automation, Inc. ("IPA"). Jabil and IPA also happen to be LSI's two largest creditors in the bankruptcy proceeding, collectively claiming that they are still owed approximately 93% of the $11.7 million in

---

[2] Exhibit 1 – Manz Report, Schedule 9.
[3] Exhibit 1 – Manz Report, Schedules 9 and 13.
[4] Exhibit 1 – Manz Report, Schedule 9.

2

outstanding bankruptcy creditor claims.[5] Thus, according to Manz's logic, cash payments that were made by LSI to Jabil and IPA to purchase equipment during the life of the company is a measure of "damages" incurred by the LSI Estate, the collection of such damages would then be used to make additional payments to Jabil and IPA in the bankruptcy proceeding. This is circular reasoning that provides no basis for a jury to actually assess damages.

Similarly, Manz's opinions do not take into consideration the sources of cash that LSI spent during its life to operate its business. For example, it is undisputed in this case that DeJoria and Wohler collectively either loaned or made equity investments in LSI to the tune of more than $11 million that LSI used to purchase equipment, pay employees and otherwise operate its business. The following chart identifies the dates and amounts of these investments as reflected in LSI's general ledger accounting records.[6]

[Chart on Next Page]

---

[5] Exhibit 1 – Manz Report, Schedule 16.
[6] All of the investments/loan were made by DeJoria or Wohler to LSI by depositing cash directly into LSI's bank accounts at either National City or Southwest Bank, except for a $310,000 loan by DeJoria on May 14, 2012. In that case, on May 14, 2012, DeJoria wired $310,000 directly to Jabil to pay an outstanding LSI debt and received a promissory note from LSI in return.

3

| Trans # | Type | Date | Name or Memo | Account | Amount |
|---|---|---|---|---|---|
| | | | **LSI General Ledger Excerpts** | | |
| | | | **DeJoria & Wohler Investments/Loans to LSI** | | |
| 6,226 | Deposit | 03/21/2011 | John Paul Dajoria Family Trust | National City | $1,000,000.00 |
| 6,569 | Deposit | 04/11/2011 | John Paul Dajoria Family Trust | National City | 500,000.00 |
| 8,834 | Deposit | 08/09/2011 | John Paul Dajoria Family Trust | National City | 3,000,000.00 |
| 10,518 | Transfer | 10/17/2011 | John Paul Dajoria Family Trust | National City | 2,000,000.00 |
| 11,453 | Deposit | 11/28/2011 | John Paul Dajoria Family Trust | National City | 1,000,000.00 |
| 11,926 | Deposit | 12/15/2011 | John Paul Dajoria Family Trust | National City | 800,000.00 |
| 12,411 | Deposit | 01/04/2012 | Jeff Wohler | National City | 50,000.00 |
| 12,912 | Deposit | 01/25/2012 | John Paul Dajoria Family Trust | National City | 300,000.00 |
| 13,127 | Deposit | 02/07/2012 | John Paul Dajoria Family Trust | National City | 300,000.00 |
| 13,254 | Deposit | 02/14/2012 | John Paul Dajoria Family Trust | National City | 300,000.00 |
| 13,269 | Deposit | 02/15/2012 | Jeff Wohler | National City | 2,500.00 |
| 13,927 | Deposit | 03/15/2012 | John Paul Dajoria Family Trust | National City | 800,000.00 |
| 14,074 | Deposit | 03/23/2012 | John Paul Dajoria Family Trust | National City | 375,000.00 |
| 15,294 | Credit | 05/14/2012 | Jabil Circuit, Inc. | 20000 · Accounts Payable | 310,000.00 |
| 17,062 | Deposit | 08/14/2012 | John Paul DeJoria | National City | 95,000.00 |
| 17,116 | Deposit | 08/14/2012 | John Paul DeJoria | Southwest Bank - Checking | 109,000.00 |
| 17,270 | General Journal | 08/29/2012 | Convertible Prossisory Note - JPD | Southwest Bank - Checking | 60,000.00 |
| 17,271 | General Journal | 09/13/2012 | Convertible Promissory Note - JPD | Southwest Bank - Checking | 100,000.00 |
| 17,272 | General Journal | 09/27/2012 | Convertible Promissory Note - JPD | Southwest Bank - Checking | 150,000.00 |
| 17,346 | General Journal | 10/30/2012 | Loan from JPD | Southwest Bank - Checking | 120,000.00 |
| **TOTAL** | | | | | **$11,371,500.00** |

Several of the other defendants similarly invested or loaned LSI collectively millions of dollars in cash during the company's lifetime that also allowed LSI to operate its business. Yet Manz does not take into consideration these investments at all in his analysis.[7] The absurdity of this position is readily apparent. Manz seeks to opine that DeJoria is liable for approximately $11 million in cash that LSI spent to operate its business after DeJoria joined the LSI board of directors, yet Manz does not take into consideration at all that DeJoria invested over $11 million that LSI used to operate its business, the vast majority of which was invested by DeJoria after or around the time he joined the board.

Equally fatal to the reliability of his analysis, Manz does not consider or take into account when LSI incurred the underlying debt for which LSI subsequently paid the cash. As Manz testified: "I have not evaluated cash outflows in the context of when the obligation to pay out that

---

[7] *See, e.g.,* Exhibit 2 – Manz Depo. 157:5-8 ("Q: Do your numbers reflect investments made by John Paul DeJoria into the company? A: This does not reflect cash inflows related to that, no.")

4

cash might have initially arisen or as a result of what document it initially arose."[8] Once again, a review of the debt owed to Jabil demonstrates how Manz's failure to consider such factors renders his cash disbursement calculations utterly meaningless as a measure of damages.

Specifically, in his damage calculations Manz estimates that to pay for equipment, largely purchased from Jabil, LSI spent (i) approximately $7.3 million in cash since DeJoria joined the LSI board in late October 2011, and (ii) approximately $2.9 million in cash since Gustin and Wohler joined the board in January 2012.[9] These cash outflows are then included in Manz's opinions for "damages" potentially owed by the DeJoria, Wohler or Gustin for fraud and breach of fiduciary duty.[10]

Yet the underlying liability for which this cash was paid was incurred by LSI in May 2011 in connection with a transaction that DeJoria, Wohler and Gustin had zero involvement in. As testified by Joe McGee,[11] the Jabil corporate representative:

- The Manufacturing Service Agreement ("MSA") between LSI and Jabil which created the liability to Jabil was entered on May 20, 2011, at a time when Wohler, Gustin and DeJoria were not on LSI's board and in a transaction in which these individuals had no involvement.[12]

- The equipment that Jabil manufactured under the MSA was ordered by LSI in September 2011 and "Mr. DeJoria, Mr. Gustin and Mr. Wohler were not part of the negotiations or the ordering of this equipment."[13]

- The only orders made for equipment by LSI were made under the original MSA and "[u]nder the new board [of DeJoria, Gustin and Wohler] not a single unit was ordered."[14]

---

[8] Exhibit 2 – Manz Depo. 184:25-185:3.
[9] Exhibit 1 – Manz Report, Schedule 13.
[10] *Id.*
[11] Excerpts from the deposition of Mr. McGee are attached hereto as Exhibit 3.
[12] Exhibit 3 – McGee Depo. 134:10-139:3; 197:21-199:21.
[13] Exhibit 3 – McGee Depo. 138:6-139:3.
[14] Exhibit 3 – McGee Depo. 163:21-164:3.

5

- Except for some minor expenses for remediation or repairing units, the amount claimed by Jabil on the Proof of Claim it filed in the LSI Bankruptcy relates to obligations incurred by the management team that was in place prior to the Defendants taking charge of the company.[15]

Similarly, LSI's former Chief Financial Officer, Matt Cohen,[16] testified as follows:

Q: The decision to enter into [the MSA with Jabil] in May 2011, Mr. Wohler, Mr. Gustin, Mr. DeJoria has zero involvement. Right sir?

A: Correct.

Q: Not in the negotiation with Jabil or even the decision itself to enter into the agreement. Right sir?

A: As you said, zero.[17]

\* \* \*

Q: The liability to pay for those units was incurred prior to Mr. Wohler, Mr. Gustin or Mr. DeJoria's involvement in the company. Right sir?

A: The contractual agreement was – yes, was consummated before John Paul and his group. The liability is more of an obligation to pay, and the obligation was definitely on the books also prior to John Paul and his group.[18]

Accordingly, similar to the other problems with his analysis, Manz's failure to tie any of LSI's cash disbursement to when or how the underlying liability for that cash disbursement was incurred render his "cash disbursement" analysis an irrelevant and unreliable method for a jury to access damages against the Defendants for fraud or breach of fiduciary duty.

Given these obvious flaws in his methodology, it is not surprising that Manz testified that he does not ever remember measuring damages based simply on cash that a company spent to operate its business.[19] Nor has the Trustee or Manz identified or cited to any case whereby cash

---

[15] Exhibit 3 – McGee Depo. 199:14-22.
[16] Excerpts from the deposition of Mr. Cohen are attached hereto as Exhibit 4.
[17] Exhibit 4 – Cohen Depo. 439:20-440:1.
[18] Exhibit 4 – Cohen Depo. 441:17-24.
[19] Exhibit 2 – Manz Depo. 156:15-22.

disbursements by a company, divorced of any analysis as to the sources, uses or timing of such disbursements, was a proper measure of damages for fraud or breach of fiduciary duty. The reason is simple – it is not a proper measure of damages.

As this Court has held in similar situations, to be admissible, an expert's testimony "must be based on sufficient facts or data, be the product of reliable principles or methods, and the expert must apply the principles and methods reliably to the facts of the case. *U.S. ex rel. Dekort v. Integrated Coast Guard Sys.*, 2010 WL 8367619 *4 (N.D. Tex. Oct. 8, 2010). Manz's opinions and testimony concerning his calculations of "cash disbursement" or the "cost of sustaining LSI" do not meet this criteria and should not be presented to the jury.

> **B. Manz should not be permitted to testify that LSI's accounting records were kept in a system that was susceptible to manipulation and/or that such records did not meet federal requirements for public companies.**

In paragraphs 22-32 of his report, Manz offers various observations and opinions to the effect that LSI's accounting records were maintained in a system (Quickbooks) that was susceptible to manipulation and that LSI's accounting records did not meet federal requirement for public companies.[20] Manz does not identify any manipulation that he believes actually occurred, nor does he tie any damages allegedly suffered by LSI to any of his accounting observations.

Moreover, the Trustee's Second Amended Complaint ("SAC") (ECF No. 34) does not make any allegations against any defendant based on Manz's accounting observations. The SAC also does not allege that any historical accounting statements filed by LSI with the SEC (e.g., income statements, balance sheets, statement of cash flows and similar historical financial statements) were inaccurate. In fact, the Trustee testified that based on her own independent

---

[20] Exhibit 1 – Manz Report pp. 11-15.

investigation using a different accounting firm, she believes that the historical financial statements reported by LSI in its SEC filings were accurate.[21]

Given these facts, Manz should not be permitted to testify about his opinions and observations in paragraphs 22-32 of his report because such prejudicial testimony is irrelevant to any issues to be presented to the jury.

      **C.    Manz should not be permitted to testify or offer opinions regarding the value of restricted stock shares issued by LSI.**

As part of his "fraudulent transfer" analysis, Manz states that since January 1, 2006, all of the Defendants in this lawsuit were collectively issued a total of approximately 24.1 million "restricted" shares of stock through either private placements, consulting agreements, employment contract or conversions of debt to shares.[22] For example, a portion of the $11 million that DeJoria invested in LSI was to purchase "restricted" shares of LSI stock from the company.[23]

The "restriction" that LSI placed on these shares meant that the shares could not be bought or sold on a public market exchange unless and until the restriction was removed.[24] Accordingly, all of the shares referenced by Manz, including those issued to DeJoria, were marked with some version of a restrictive LEGEND that prevented the shares from being bought or sold on a public exchange.[25]

---

[21] Exhibit 5 – Ebert Depo. 219:2-220:11. Excerpts from the deposition of Carey Ebert are attached hereto as Exhibit 5.
[22] Exhibit 1 – Manz Report at ¶ 39.
[23] *See* DeJoria LSI Stock Subscription Agreement, attached hereto as Exhibit 6.
[24] *Id.* at p. 1 ("I understand that the Shares have not been registered under the Securities Act of 1933 … [and] I cannot sell or otherwise dispose of the shares unless the shares are registered under the Act or the state securities laws or exemptions therefrom are available (and consequently, that I must bear the economic risk of the investment for an indefinite period of time") (emphasis in original).
[25] *Id.* at p. 2.

8

As Manz correctly recognizes, because the restricted shares were illiquid and could not be freely bought or sold on a public market exchange, such shares were plainly less valuable than LSI shares that did not contain restrictions and thus could be freely bought or sold on a public exchange.

Nevertheless, in his report Manz used the public trading price of unrestricted LSI shares to opine that "Defendants received approximately $23.9 million in restricted stock value (net of consideration paid) from January 1, 2006 through November 9, 2012."[26]  To reach this figure, Manz purported to account for the restrictive nature of the shares by applying "a 30 percent discount to the then-current market price."[27]  In doing so, however, he admittedly did not consider any of the facts or circumstances specific to an investment in LSI, instead stating: "[t]his figure [the 30% discount] is an approximation and does not constitute an opinion as to the value of LSI's restricted shares."[28]

The facts and circumstance of a company clearly matter in determining the appropriate discount level to apply, or even if applying a discount to public market prices is appropriate at all, to place a value on a "restricted" share of stock.  For example, the discount applied to a "restricted" share of an established and well capitalized company, such as Apple Computers, would plainly be smaller than the discount applied to a "restricted" share in an early stage development company, such as LSI, that never reported any material revenues, never reported a profit, was thinly capitalized, and might not even be in existence if or when the restriction gets removed.  Manz does not take into consideration any such factors when applying a blanket 30% discount.

Manz also makes no attempt to consider when the shares were issued.  For example, the discount applied to restricted shares issued in 2010 when the company initially began trading on a

---

[26] Exhibit 1 – Manz Report at ¶ 39.
[27] Exhibit 1 – Manz Report at ¶ 39 n.87.
[28] *Id.*

public exchange would have to be different than the discount applied to a share issued in 2012, when the company was on the verge of bankruptcy. Yet Manz makes no attempt to account for differences in timing when applying a 30% blanket discount.

Bottom line, by his own admission, his application of a discount was "an approximation" that "did not constitute an opinion as to the value of LSI's restricted shares." As such, any testimony or opinions by Manz as to the value of LSI's restricted shares would not be reliable or otherwise meet the standard for expert testimony on this topic and should not be presented to the jury.

### D. Manz should not be permitted to testify about any opinion based on a claim that LSI was a "fraud from inception."

In paragraphs 42-43 and 61 of his report, Manz offers opinions based on a purported allegation that "LSI was a fraudulent enterprise from its inception." Manz should not be permitted to offer these opinions, however, because the Trustee's SAC does not make any such fraud allegation or seek damages based on a claim that LSI was "a fraudulent enterprise from its inception."

Instead, in her SAC the Trustee has pled just three species of fraud against the Defendants: (a) "fraud in connection with false public statements and false financial filings issued by LSI" – which the Trustee agreed to limit to "Shareholder Holder Claims" that are the subject of a pending motion for summary judgment,[29] (b) "fraud in connection with the receipt and transfer on the open market shares of LSI to which defendants were either not entitled and/or which they exploited through the use of inside, LSI corporate information", and (c) "fraud in connection with accepting proceeds or benefits paid by LSI for professional services that were either nonexistent or

---

[29] *See* Trustee's More Definite Statement as to Her Fraud Claim (ECF No. 179); Defendants' Motion for Summary Judgment (ECF No. 191).

10

essentially worthless at the expense of LSI and its legitimate shareholders and creditors." SAC ¶ 602(a)-(c) (ECF No. 34). As such, any testimony by Manz based on the unpled claim that LSI was a fraud from inception should not be permitted because such prejudicial testimony is irrelevant to any issue to be presented to the jury.

### E. Manz should not be permitted to testify about purported "red flags" or "badges of fraud" associated with an alleged "pump-and-dump scheme."

In paragraphs 15-19 and 21 of his report, Manz offers observations and testimony related to purported "red flags" or "badges of fraud" associated with an alleged pump-and-dump scheme of LSI's stock. Manz should not be permitted to offer such testimony, however, because he admittedly did not perform any analysis or investigation into whether a pump-and-dump of LSI's stock actually occurred. Nor has the Trustee identified any other expert who performed any such analysis.

To establish a pump-and-dump of LSI's stock, by definition the Trustee would have to show that there was an improper "pump" that artificially raised the price of LSI's stock and a subsequent "dump" of such stock by a defendant at artificially inflated values. But Manz has not analyzed whether either a pump or dump actually occurred in this case. Although he repeatedly attempted to evade answering simple questions about any such analysis during his deposition,[30] he eventually testified as follows:

> Q: What evidence have you seen that shows that the stock of LSI was promoted or pumped?

---

[30] Exhibit 1 – Manz Depo. 94:3-103:22.

11

>A: I don't know that I have reviewed evidence to analyze that allegation.[31]

* * *

>Q: What you can tell Defendants is who sold stock in the company, but you aren't able to directly tie that to a pump-and-dump are you?
>
>A: I don't tie – I don't tie my analysis, the selling of shares in the company and the gaining of proceeds from selling shares to elevated prices related to a pump-and-dump because I didn't analyze elevation of prices.[32]

* * *

>Q: So my question to you is: When is the date that you believe a pump-and-dump began with LSI, and I'll ask you for a year to start with?
>
>A: I don't know that I could name a date for that.[33]

Nor has the Trustee identified any other expert to testify or provide any analysis to establish that an improper pump or dump of LSI's stock occurred; or identified any damages suffered by LSI as a result of an alleged pump-and-dump. Without such analysis or evidence, any testimony by Manz concerning red flags of a pump-and-dump would be pure speculation offered to confuse or prejudice the jury, and Manz should not be permitted to offer such testimony or opinions at trial. *See, e.g.*, FED. R. EVID. 703 ("[I]f facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.").

**PRAYER**

For all the foregoing reasons, Defendants respectfully request that, pursuant to Federal Rules of Evidence 401, 402, 403, 602, 702, and 703, this Court should issue an order instructing

---

[31] Exhibit 1 – Manz Depo. 97:20-23.
[32] Exhibit 1 – Manz Depo. 102:20-103:4.
[33] Exhibit 1 – Manz Depo. 103:19-22.

Plaintiff not to refer to, interrogate any witnesses concerning, comment on, or introduce in any way expert opinions and testimony by Robert Manz as described in this Motion.

    Respectfully submitted,

    */s/ Charles B. Hampton*
    Thomas M. Farrell
    State Bar No. 06839250
    tfarrell@mcguirewoods.com
    Charles B. Hampton
    State Bar No. 00793890
    K. Knox "Lighthorse" Nunnally
    State Bar No. 24063995
    knunnally@mcguirewoods.com
    MCGUIREWOODS LLP
    600 Travis Street, Suite 7500
    Houston, Texas 77002
    (713) 571-9191 (Telephone); (713) 571-9652 (Fax)

    *Counsel for John Paul DeJoria,*
    *Mike Gustin, and Jeffrey Wohler*

## **CERTIFICATE OF SERVICE**

   I hereby certify that a copy of the foregoing document was served via the Court's ECF system to counsel, on this 31st day of May, 2017.

  J. E. Cullens, Jr
  Jennifer Wise Moroux
  Walters Papillion Thomas Cullens LLC
  12345 Perkins Road, Bldg One
  Baton Rouge, LA 70810
  Email: cullens@lawbr.net
  Email: jmoroux@lawbr.net

  John Charles Anderson
  Anderson Firm, LLC
  P.O. Box 82982
  Baton Rouge, LA 70884
  Email: jca@andersonfirm.net

  Robin E Phelan
  Haynes & Boone LLP
  2323 Victory Ave., Suite 700
  Dallas, TX 75219-7673
  Email: robin.phelan@haynesboone.com

  Mark B French
  Law Office of Mark B French
  1901 Central Dr., Suite 704
  Bedford, TX 76021
  Email: mark@markfrenchlaw.com

  Kenneth R. Shemin
  Shemin Law Firm, PLLC
  3333 Pinnacle Hills Parkway, Suite 603
  Rogers, AR 72758
  Email: ken@sheminlaw.com

                */s/ Charles B. Hampton*
                Charles B. Hampton