ORIGINAL

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

4:15-cv-225-0

FILED

JUN 21 2019

CLERK, U.S. DISTRICT COURT
By _____
    Deputy

No. 18-10382

FILED
April 30, 2019

Lyle W. Cayce
Clerk

In the Matter of:  LATITUDE SOLUTIONS, INCORPORATED,

>    Debtor

CAREY D. EBERT,

>    Appellee

v.

JOHN PAUL DEJORIA; HOWARD MILLER APPEL; EARNEST A. BARTLETT, III; MATTHEW J. COHEN,

>    Appellants

---

Appeals from the United States District Court
for the Northern District of Texas

---

Before BARKSDALE, SOUTHWICK, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

This appeal involves two competing versions of the history and purpose of Latitude Solutions, Inc. ("LSI").  Howard Appel, Earnest Bartlett, Matthew Cohen, and John Paul DeJoria ("Appellants") characterize LSI as a publicly traded company which sought to commercialize technology that could remediate contaminated water but was unsuccessful as a speculative venture. On the other hand, LSI's bankruptcy trustee, Carey Ebert, characterizes LSI

No. 18-10382

as a fraud from its inception—used only as a mechanism for Appellants to participate in and profit from a securities fraud scheme. Ebert sued several of LSI's corporate officers, directors, and investors for breaches of fiduciary duty. By the end of trial, her case focused primarily on a contract LSI entered into with Jabil Inc., one of LSI's bankruptcy creditors. The jury found Appellants liable and assessed millions of dollars in compensatory and exemplary damages. Appellants present various arguments for why we should overturn the jury verdict and reduce damages, including whether Ebert has Article III standing and whether there was legally sufficient evidence for the jury to find as it did. We AFFIRM in part, REVERSE and RENDER in part, VACATE in part, and REMAND for further consideration consistent with this opinion.[1]

## I.   Background

This appeal stems from a jury verdict and final judgment adjudicating Matthew Cohen and John Paul DeJoria liable for breaches of fiduciary duty to LSI and finding Howard Appel and Earnest Bartlett liable for aiding and abetting those breaches. The final judgment awards Ebert compensatory damages against (i) Appel, Bartlett, Cohen, and DeJoria for $6.9 million, jointly and severally, for Cohen's breach of fiduciary duty; (ii) Appel and Bartlett for $2.5 million each for aiding and abetting Cohen's breach of fiduciary duty; (iii) DeJoria for $1.5 million for his breach of fiduciary duty; and (iv) Appel for $5 million, Cohen for $2 million, and DeJoria for $1 million in exemplary damages.

---

[1] As explained more fully below, we reverse and render judgment in favor of Appel, Bartlett, and DeJoria. As for Cohen, we vacate damages awarded under Damage Element No. 1, affirm damages awarded under Damage Element No. 2, and remand to the district court to consider the legal issues surrounding exemplary damages against Cohen in the first instance.

No. 18-10382

## A. LSI

The parties disagree on the basic premise of LSI's formation. Ebert asserts LSI was a sham company set up to fail from the outset, and a vehicle for Appellants to participate in a securities fraud scheme known as "pump-and-dump," while Appellants claim LSI was legitimately founded to develop and commercialize technology capable of remediating contaminated water. LSI was a publicly traded company that began operating in 2009 and developed patented technology for treatment of wastewater in the oil and gas industry. LSI was a speculative venture that eventually filed for bankruptcy in November 2012.[2]

## B. Matthew Cohen

Cohen was one of the founding members of LSI and served as an officer and director of LSI from March 2009 through June 2012. Cohen was the Chief Financial Officer of LSI from June 2011 to June 2012.

## C. Howard Appel

Appel was a business consultant to and raised capital for LSI. In 2004, before LSI existed, Appel pled guilty to conspiracy to commit securities fraud as well as conspiracy to commit money laundering and served twenty-one months in prison. The parties vehemently disagree whether this is relevant to LSI. The trustee uses Appel's conviction as evidence of a pattern of nefarious behavior, while Appellants argue Appel's past is the only reason for the trustee's lawsuit, despite no evidence that Appel engaged in any criminal conduct related to LSI. An LSI board member introduced Appel to the

---

[2] Aside from the allegations regarding each Appellant's conduct, which are discussed below, LSI experienced internal control and accounting issues. For example, its financial team used accounting software that was inadequate for a publicly traded company and eventually self-reported to the Department of Justice on suspicions of fraud and stock manipulation.

No. 18-10382

company in 2010, which eventually led to Appel's family and friends investing in LSI beginning in February 2011. Appel was responsible for raising at least $12 million in capital for LSI through outside investors. Appel did not purchase or sell any shares of LSI stock.

### D. Earnest Bartlett

Bartlett is a friend and business associate of Appel. Appel introduced Bartlett to LSI. A company affiliated with Bartlett, FEQ Realty, invested in LSI beginning in December 2010. In April 2011, FEQ Realty entered into a consulting agreement with LSI. Appel provided his consulting services to LSI as an outside consultant under FEQ Realty's consulting agreement. Bartlett never purchased or sold any LSI stock.

### E. John Paul DeJoria

DeJoria is an entrepreneur and philanthropist with an interest in developing clean-water solutions. He invested and lost over $11 million in LSI beginning in March 2011. For most of 2012, DeJoria was LSI's primary source of funding. DeJoria served on LSI's board of directors from October 2011 to September 2012.

### F. Jabil, Inc.

Jabil, Inc., is not a party to the case but plays a crucial role here. In May 2011, Jabil entered into an agreement with LSI to manufacture remediation equipment. The parties dispute whether the deal was done for legitimate purposes. Jabil is a creditor in LSI's bankruptcy, with a claim for $9.55 million. By the end of evidence at trial, the trustee conceded the only damages the estate could recover were 1) the amount of the Jabil debt and 2) the amount of any gains to the defendants that the trustee could specifically link to fiduciary breaches.

4

No. 18-10382

## G. LSI's Bankruptcy and the District Court Proceedings

Carey Ebert was appointed as LSI's Chapter 7 bankruptcy trustee, and the matter was eventually converted into a Chapter 11 proceeding. As the Chapter 11 trustee, she attempted to find investors to invest in LSI and lease equipment to keep LSI operating. Ebert, however, was unable to generate enough revenue to allow the company to resume business. Ebert filed the operative complaint in November 2015, raising various claims against over twenty defendants. With respect to the Appellants, Ebert alleged that Appel gained practical control of LSI and used it to perpetrate securities fraud and engage in insider trading; that LSI was a fraud formed for an illegitimate purpose; that Appel and Bartlett made substantial profit through manipulative conduct; and that Cohen and DeJoria joined in the conspiracy to profit from stock manipulation.

By the close of evidence at trial, the lawsuit had narrowed significantly— numerous counts and more than a dozen defendants were dismissed. The claims that went to the jury were one count each of a breach of fiduciary duty owed to LSI against Cohen and DeJoria, and one count of aiding and abetting Cohen's breach of fiduciary duty against DeJoria, Appel, and Bartlett. As noted above, based upon the evidence presented, the only damages remaining at issue were 1) the amount of the Jabil debt and 2) the amount of any gains to the defendants that the trustee could specifically link to fiduciary breaches.

Appellants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) and the district court carried the motions. The district court then held a charge conference, at which the parties agreed to the following: Question 1 would determine whether Cohen and DeJoria breached their fiduciary duties with a "yes" or "no" answer. Question 2 would determine

5

No. 18-10382

whether Appel, Bartlett, and DeJoria aided and abetted[3] Cohen's breach of fiduciary duty. Question 3 limited the trustee's damages to the following:

> Damage Element No. 1: The reasonable cash market value of liabilities incurred by LSI as a proximate cause of that defendant's breach of fiduciary duty, which liabilities are still owed and have not yet been paid, if any.

> Damage Element No. 2: The reasonable market value of any gains to that defendant (including salaries, consulting fees, net proceeds from stock issuances to directors and/or officers of LSI, and other expenses) proximately caused by that defendant's breach of fiduciary duty.

Questions 4 and 5 would determine eligibility for and quantify exemplary damages. The jury found Cohen and DeJoria each committed a breach of fiduciary duty and Appel, Bartlett, and DeJoria aided and abetted Cohen's breach. The jury assessed damages as follows:

| Defendant | Damage Element No. 1 | Damage Element No. 2 |
|---|---|---|
| Appel | $0 | $2.5 million |
| Bartlett | $0 | $2.5 million |
| Cohen | $6.5 million | $400,000 |
| DeJoria | $1.5 million | $0 |

The jury also assessed exemplary damages of $5 million against Appel, $2 million against Cohen, and $1 million against DeJoria. Following the jury verdict, all four Appellants renewed their motions for judgment as a matter of law. The district court denied their motions, granted Ebert's motion for

---

[3] Because of our conclusions below, we do not reach the issues surrounding whether "aiding and abetting" a breach of fiduciary duty was a proper jury submission in this case.

No. 18-10382

judgment, and later denied motions for reconsideration. This timely appeal followed.

## II.  Discussion

A. *Ebert Lacks Article III Standing to Recover Jabil's Damages*

Appellants argue that Ebert lacks Article III standing to recover Jabil's damages under Damage Element No. 1 of the jury charge. Article III standing requires a plaintiff to have "suffered an 'injury in fact,'" show "a causal connection" between the injury and the conduct at issue, and the injury must be redressable by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[A] plaintiff must demonstrate standing for each claim [s]he seeks to press" and have "standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted).

Ebert's liability theory with respect to Cohen and DeJoria's breaches of fiduciary duty focused on Jabil.[4]  In her closing argument, she claimed "the fraud, the improper conduct, was entering into the Jabil contract in May 2011 . . . that's what caused the damages." Ebert argued Jabil was misled because they "weren't given access to [LSI's] books," and were unaware of Appel's involvement or prior criminal history. As for damages, Ebert consistently asserted that she was seeking the amount of the Jabil debt, stating that "we know Jabil lost 9.5 million" and asked the jury to "forget about the other hundred and something creditors . . . focus on Jabil."

Under Damage Element No. 1, the jury was asked to assess "the reasonable cash market value of liabilities incurred by LSI as a proximate

---

[4] We note one additional point relevant only to DeJoria:  DeJoria did not become a director at LSI until October 2011, some five months after LSI entered into the Jabil contract. Ebert provided no evidence that DeJoria should be liable for the damages incurred by action that predated his time as an LSI director.

No. 18-10382

cause of that defendant's breach of fiduciary duty, which liabilities are still owed and have not yet been paid, if any." But the millions of dollars awarded under Damage Element No. 1 represent Jabil's injury, not LSI's. Jabil manufactured and delivered the contractually agreed upon equipment to LSI. LSI benefitted from the equipment, and Ebert even leased and sold the equipment in Chapter 11 proceedings. Moreover, LSI did not pay the invoices on the equipment. Therefore, LSI *benefitted* and even had cash available for other needs.

Although we have not squarely addressed Article III standing under the circumstances presented in this case, Appellants note several persuasive authorities holding there was no Article III standing in factually analogous scenarios. In *In re Waterford Wedgwood USA, Inc.*, 529 B.R. 599 (Bankr. S.D.N.Y. 2015), the debtor "failed to contribute the full amount it owed" to a retirement plan it sponsored. *Id.* at 601. The debtor hired an accounting firm to audit the retirement plan, but the firm failed to notify the debtor about the underfunding. *Id.* at 601. The bankruptcy trustee for the debtor sued the firm for unpaid liabilities to the retirement plan. *Waterford* held that the bankruptcy trustee lacked Article III standing because the debtor had not suffered an injury. *Id.* at 604–05. The court reasoned that "the trustee alleges damages to the debtors, to the extent of the unpaid obligations of the debtors to the creditors . . . [but] the Debtor appears to have benefitted from not paying the required Retirement Plan contributions by gaining the use of funds that should have been in the Retirement Plan's possession." *Id.* at 605 (citing *In re Am. Tissue, Inc.*, 351 F. Supp.2d 79, 93–94 (S.D.N.Y. 2004) (holding that a debtor could not characterize its monetary gain as injury)). The *Waterford* Court went on to state that the trustee could "allege a constitutional injury. . . if the bankruptcy estate paid any of the shortfall." *Id.* at 605. *Waterford* shares

8

No. 18-10382

the factual circumstances of this case—a bankruptcy trustee sued and argued a debt it owes constitutes an injury, despite having made no payments. In fact, LSI gained even more than the debtor in *Waterford* because it benefitted from not paying Jabil's invoice *and* retained and then sold the manufacturing equipment.

In *Reneker v. Offill*, 2009 WL 804134 (N.D. Tex. Mar. 26, 2009), a receiver for various entities sued the entities' attorneys for negligence, violations of securities laws, and the consequent $36.5 million liability owed to investors. *Id.* at *5. Citing *In re American Tissue*, the *Reneker* Court held the receiver lacked Article III standing because "the only harm alleged is the Receivership Estate's inability to satisfy its liabilities." *Id.* at *6. The court held the receiver did not have Article III standing to sue for damages his clients did not suffer, stating "[t]he Receivership Estate's financial inability to satisfy liabilities owed to investors as a result of securities-laws violations harm[ed] the investors," not the receiver. *Id. Reneker* is also analogous to LSI's case; the receiver and bankruptcy trustee are similarly situated, while Appellants are similarly situated to the attorneys accused of negligence. Jabil and the investors in *Reneker* are both creditors. In addition, the securities laws violations are analogous to the Jabil contract as the event the receiver and trustee argue caused damages. Based on the triggering events, Ebert and the receiver attempted to recover damages owed because of fraudulent or negligent conduct.

Ebert responds that LSI suffered harm by taking on millions of dollars in debt. She analogizes to *Norris v. Causey*, 869 F.3d 360 (5th Cir. 2017), to argue for standing. We held in *Norris* that "[t]he Norrises' injury is clear: they lost thousands of dollars." *Id.* at 366. However, *Norris* is distinguishable; the Norrises wrote checks for $48,000, $45,000, and $1,000, but the Causeys never

9

No. 18-10382

moved forward with their end of the bargain. *Id.* at 364. Here, LSI did not pay Jabil's invoice but still retained Jabil's end of the bargain, the manufacturing equipment. Ebert also cites *Norris* for the proposition that "this litigation can redress the loss through damages, as the judgment demonstrates." *Id.* at 366. But this argument refers to redressability, not LSI's injury in fact, and is thus inapposite.[5]  Accordingly, all damages awarded under Damage Element No. 1 against any defendant must be reversed for lack of Article III standing (thus leaving no actual damages against DeJoria).[6]

B. *A Reasonable Jury Could Find Cohen Liable for Breach of Fiduciary Duty Owed to LSI*

Cohen argues[7] that he is entitled to judgment as a matter of law because there is not legally sufficient evidence to prove he breached his fiduciary duty to LSI. "We review a district court's ruling on a motion for judgment as a matter of law *de novo.*" *Nobach v. Woodland Vill. Nursing Ctr., Inc.*, 799 F.3d 374, 377 (5th Cir. 2015) (footnote and citation omitted). When reviewing a district court's denial of a post-verdict Rule 50(b) motion, we assess "whether a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Id.* (quoting FED. R. CIV. P. 50(a)(1)). Despite our

---

[5] In its order denying Appellants' post-verdict motions, the district court held there was sufficient evidence to support a jury finding that Appellants' breaches of fiduciary duty caused the damages the jury awarded, citing Jabil's proof of claim filed in bankruptcy court and the trial testimony of Jabil representatives. But this rationale only addresses what Jabil's injury and damages were; it does not explain how LSI was injured.

[6] We need not address and therefore do not hold that there could not possibly be an Article III injury in fact stemming from Cohen and DeJoria's breaches of fiduciary duty. Instead, we hold there is no Article III injury stemming from the claims Ebert asserted and Damage Element No. 1 of the jury instruction.

[7] Ebert argues Cohen has waived this argument but is mistaken; Cohen raised this issue during Rule 50(a) arguments and in his Rule 50(b) motion, as the district court noted.

No. 18-10382

holding in Section II.A, we address this issue because it concerns damages awarded under Damage Element No. 2.

Texas law required Ebert to prove: 1) that a fiduciary relationship existed; 2) that Cohen breached his fiduciary duty to LSI; and 3) that Cohen's breach resulted in injury to LSI or benefitted him. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007). The first element is not in dispute. Cohen's fiduciary duty required a duty of loyalty and duty of care to LSI.

As noted above, Ebert's case began by alleging an elaborate pump-and-dump scheme of LSI's stock and widescale fraud, but by the time the case was submitted to the jury, Ebert's argument was based entirely on the Jabil contract:

> the fraud, the improper conduct, was entering into the Jabil contract in May 2011. That's what inevitably caused this company to collapse, that's what caused the damages, and that was the impetus of why or purpose of this fraudulent scheme was to enter into that Jabil contract, make a big splash, make it seem like this was a legitimate business when it had no hope for survival.

Ebert provided the following evidence to support her claim: Cohen took on Appel as an advisor and spoke to him daily; Cohen sent Appel non-public information, including lists of shareholders and stock sales on a weekly basis; Cohen dealt personally with Jabil; prior to the Jabil contract, Cohen had not told anyone at Jabil about Appel's conviction for securities fraud manipulation; LSI had no idea whether the machinery from the Jabil contract would work; LSI had no business plan, or leads to monetize the equipment from the contract, but Cohen and Appel drafted LSI press releases together to generate good news and publicize it; and while still a director, Cohen sold his stock in LSI for $400,000 because he "needed to have some money in the bank."

11

No. 18-10382

Cohen contends that his conduct is protected by the business judgment rule. In Texas, the "rule . . . protects corporate officers and directors, who owe fiduciary duties to [a] corporation[] from liability for acts that are within the honest exercise of their business judgment and decision." *Sneed v. Webre*, 465 S.W.3d 169, 173 (Tex. 2015) (citation omitted). Negligent, unwise, inexpedient, or imprudent actions are protected so long as "the actions [are] 'within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved.'" *Id.* at 178 (quoting *Cates v. Sparkman*, 11 S.W. 846, 849 (Tex. 1889)) (footnote omitted). The jury charge, however, instructed the jury on both what is required to show a breach of fiduciary duty, along with the parameters of the business judgment rule. Given Cohen's actions, a reasonable jury could weigh the evidence, consider the business judgment rule, but conclude that Cohen breached his fiduciary duty to LSI.

Cohen also argues that because the existence of an attempted pump-and-dump securities fraud scheme would not be clear to a jury, Ebert was required to offer expert testimony supporting her claim. However, the case he cites, *Fener v. Operating Engineers Construction Industry & Miscellaneous Pension Fund (LOCAL 66)*, 579 F.3d 401, 409 (5th Cir. 2009), stands for a different proposition: that proving a loss causation claim under § 10(b) of the Securities Exchange Act of 1934 requires "the testimony of an expert—along with some kind of analytical research or event study." *Id.* No such claim exists here. Even if we were to apply Cohen's standard, Ebert *did* put on an expert who testified extensively about red flags of a pump-and-dump scheme in the securities industry and how LSI demonstrated a number of those traits. We therefore reject this argument.

12

No. 18-10382

The jury assessed damages of $400,000 against Cohen under Damage Element No. 2. Cohen argues there is no evidentiary support for this monetary amount. But Cohen himself testified that he made $557,109 in salary for his time at LSI and sold about $400,000 of LSI stock because he "needed to have some money in the bank." None of Appellants' lawyers objected during this testimony. Damage Element No. 2 allowed for damages from "the reasonable market value of any gains to that defendant (including salaries, consulting fees, net proceeds from stock issuances to directors and/or officers of LSI . . . ) proximately caused by that defendant's breach of fiduciary duty."

Considering the jury found Cohen liable for a breach of fiduciary duty based on an alleged pump-and-dump scheme and improperly propping up LSI by entering the Jabil contract for nefarious purposes, there is legally sufficient evidence for a reasonable jury to award $400,000 in damages.

C. *Ebert Did Not Provide Legally Sufficient Evidence to Show Appel and Bartlett Personally Received Gains from Stock Sales*

Appel and Bartlett were not liable for damages under Damage Element No. 1. On the other hand, the jury found Appel and Bartlett liable for $2.5 million each under Damage Element No. 2 for aiding and abetting Cohen's breach of fiduciary duty, which allowed the jury to award damages for the "reasonable market value of any gains to that defendant (including salaries, consulting fees, net proceeds from stock issuances to directors and/or officers of LSI, and other expenses) proximately caused by that defendant's breach of fiduciary duty."

Appel and Bartlett argue that Ebert presented no evidence they received gains from stock sales in their individual capacity and that any evidence instead relates to entities affiliated with them. Ebert cites the expert testimony of Robert Manz as the "critical evidence" to support Appel and Bartlett's damages calculation. Manz testified that a "nominee company" is

13

No. 18-10382

one that "stands in the place of a person or another company," and is often used to "hide the identity of a person or another entity." Manz also testified that Appel owned more than 5% of LSI's outstanding stock through nominee companies, that Bartlett owned another 1.5% of LSI through nominee companies, that Appel, Bartlett, and their associates earned a total of $5.1 million of profit from LSI stock, and that FEQ Realty made $2.3 million in profit from LSI stock. In its denial of Appellants' post-verdict motions, the district court cited Manz's testimony to uphold the jury's verdict.

Through Manz's testimony, however, Ebert tacitly admits that she provided evidence only for the nominee companies' gains, not for Appel and Bartlett in their individual capacity. Manz's calculations were based primarily on two documents: Schedule 7.B, which showed market sales of LSI stock, and a list of nominee companies with how many shares of LSI each owned as of September 9, 2011. Yet these documents only list companies and provide no proof of or insight into Appel and Bartlett as individuals. Ebert originally named a number of these entities as defendants in her lawsuit, including FEQ Realty, LLC, DIT Equity Holdings, Capital Growth Realty, and Wiltomo Redemption Foundation. But she eventually dismissed them with prejudice. Perhaps most significantly, Manz testified that "I don't know exactly what you define as the Appel Group" and acknowledged that he had no insight on whether or how a company was related to Appel. Instead, Ebert's counsel simply informed Manz "what constituted Appel-related companies" for the document. Manz was also unable to answer questions about the various entities in his documents and testified that he had not tracked down the alleged gains to Appel and Bartlett individually.

Because Ebert did not provide evidence against Appel and Bartlett in their individual capacities and the entities and companies in question were

14

No. 18-10382

dismissed with prejudice, the only way Appel and Bartlett could be liable is under an alter ego theory. Ebert, however, made no attempt to make such a showing. On appeal, she argues that a jury could impose damages based on Appel and Bartlett's nominee companies because "a party cannot invoke the corporate form 'as a cloak for fraud or illegality or to work an injustice,'" citing *Matthews Construction Company, Inc. v. Rosen*, 796 S.W.2d 692, 693 (Tex. 1990). However, even if we assumed the most generous reading of her corporate form arguments under Texas law, *cf.* Texas Business Organizations Code § 21.223, she provided no evidence to support piercing the corporate veil or any alter ego theory. Thus, Ebert did not provide legally sufficient evidence for a reasonable jury to find Appel and Bartlett liable in their individual capacities. We therefore REVERSE the damages against Appel and Bartlett under Damage Element No. 2, leaving no actual damages against them.

D. *Exemplary Damages*

No exemplary damages were awarded against Bartlett. In light of our holding leaving no actual damages against Appel and DeJoria, the judgment awarding exemplary damages against them must be vacated. TEX. CIV. PRAC. & REM. CODE 41.004(a) (requiring more than nominal damages to be awarded before exemplary damages can be awarded). Therefore, the only remaining actual damages are the $400,000 awarded against Cohen under Damage Element No. 2. In addition to the damages cap under Texas law (TEX. BUS. & COMM. CODE § 41.008(b)), the jury was instructed to consider "the character of the conduct involved" and "the nature of the wrong" before assessing exemplary damages.[8] But because portions of the "conduct" and "wrong" are

---

[8] Texas law requires that the trier of fact "consider the definition and purpose of exemplary damages as provided by Section 41.001" in making an award of exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.010. It further requires that the trier of fact

No. 18-10382

no longer viable as a matter of law, the jury may have awarded a different amount of exemplary damage against Cohen than the $2 million it awarded. Neither party has briefed the effect of this potential outcome on the exemplary damages awarded against Cohen. We conclude that this issue should be addressed in the first instance by the district court following full briefing. We therefore VACATE the exemplary damages award and REMAND to the district court to consider the legal issues surrounding exemplary damages against Cohen in the first instance.

## III.   Conclusion

In light of the foregoing decision, Appel, Bartlett, and DeJoria are entitled to judgment rendered in their favor: (1) DeJoria, because of the lack of proof of a recoverable injury, *see Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.—Fort Worth 2011, no pet.) and the corresponding vacatur of exemplary damages; (2) Appel, because there was no evidence of individual liability and the corresponding vacatur of exemplary damages; and (3) Bartlett, because there was no evidence of individual liability. Thus, we REVERSE and RENDER judgment in favor of Appel, Bartlett, and DeJoria. As for Cohen, we VACATE damages awarded under Damage Element No. 1, AFFIRM damages awarded under Damage Element No. 2, and REMAND to the district court to consider how our opinion impacts the award of exemplary damages.

---

consider evidence relating to, among other things, the "nature of the wrong" and the "character of the conduct involved." *Id.* at § 41.011.

16